We're here today in cause number 20-20207, Valentine v. Collier. Is the appellant ready to proceed? Yes, your honor. Appellee, ready to proceed? Yes, your honor. Are there any matters that we need to take up before we begin with the argument? Appellant? Not that I'm aware of, your honor. Appellee? No, your honor. All right. Appellant, you may proceed. Thank you, your honor. And may it please the court, Kyle Hawkins for the defendants. The district court's preliminary injunction is patently unlawful and should be reversed for three independent reasons. First, the injunction is barred by the PLRA because the plaintiffs did not exhaust their administrative remedies and the record shows those remedies were available. Second, the injunction rests on an incorrect understanding of the Eighth Amendment's application of the deliberate indifference standard. Since the start of the pandemic, defendants have gone above and beyond what the Constitution requires to secure the safety of offenders and staff consistent with the restraints inherent in running a prison system. That is the opposite of deliberate indifference. Third, the injunction violates the PLRA because it is impermissibly overbroad and grants class-wide relief beyond what is necessary to remedy the and the district court failed to analyze whether less restrictive means were available. Each of these three... Mr. Hawkins? Yes, Judge Davis. Would you start, please, by reporting on the questions that we sent out to be answered today? Yes, your honor. And before I do so, I'd like to be clear that all the information I'm about to give your honor is outside the record on appeal. Well, that may change if we allow it to be included in the record, which we'll take up later. So your honor presented a number of questions by email and I'll go through them in turn. Your honor's questions went to the current statistics in the PAC unit. I'll provide those now. The PAC unit has provided over 2,000 tests in total. That's 1,708 offender tests, 333 employee tests. There are 191 offenders with confirmed infections and nine employees with confirmed infections. 12 offenders are hospitalized, all offsite. There have been five deaths at the PAC unit. The court has also asked about all measures currently being undertaken to protect inmates. I've got a lot of notes on this and it'll take me some time to go through it, but I'll do so in detail. First, as I just indicated, every offender and every staff member has been tested for COVID-19. Some of them have been tested multiple times. Turning next to the PAC unit's education efforts, TDCJ has produced a video that is displayed three times per day on televisions in each dorm, informing offenders of ways to protect themselves from COVID-19. That goes to the symptoms of COVID-19, instructions to wash hands frequently, the importance of wearing a mask, the importance of maintaining separation from others. There are twice weekly announcements in English and Spanish that medical co-pays have been waived. There are signs instructing inmates to wash hands frequently, posted in each dorm and in high traffic areas. There are educational posters placed on dorm walls. Correctional officers talk to offenders and answer questions during count checks and daily rounds in each dorm. Medical staff talk to offenders and answer questions when conducting temperature checks and well checks. Each offender has been given a copy of the CDC handout, share facts about COVID-19. The prison has also implemented contact tracing, which I will discuss in more detail in a moment. It is quarantining offenders who return to the PAC unit after a hospital stay for 14 days in the education building. The self-quarantining employees who test positive. There's a precautionary lockdown in place. It's been in place since before the PI hearing, restricting offender movement and interaction. PAC unit is medically isolating those who test positive. As I just indicated, there are temperature and well checks twice daily performed by medical staff. The offenders have unlimited access to hand soap and water. Clean hand towels are provided to each offender and those are exchanged for fresh towels daily. Extra toilet paper is provided at no cost. Cotton masks have been provided to each offender and those are exchanged for fresh masks daily. The staff has issued N95 masks and face shields to be worn at all times inside the unit. Each offender is given cleaning supplies to use in his cubicle. There is regular cleaning of common areas. Each inmate janitor receives a new pair of wrist length vinyl gloves at the start of his shift. Replacement gloves are available at any time during the shift and additional gloves or cleaning supplies are available upon request or as determined by the PAC unit property officer who makes rounds during each and of course, as I mentioned a moment ago, medical copays are waived. Now the court has also sent questions regarding the relocation of offenders. Again, speaking outside the record, every offender in the PAC unit has been tested and offenders testing positive have been isolated from offenders who are testing negative. Dorms 13 through 16 and cells in the restricted housing unit are used to medically isolate those who have tested positive. 12 PAC unit defenders, as I mentioned a moment ago, have been hospitalized off-site at a local hospital or at hospital Galveston. That says the end of the day on 5.6. The court asked where are offenders who have been in contact with the affected persons relocated to. Offenders who have been exposed, as I'll define in a moment, are being placed in medical restriction for evaluation in dorms 17 through 20 and the criteria for determining who has been in contact matches the recommendations we've received. An offender is considered to have been exposed if he has been in close contact for longer than 15 minutes with someone who tested positive for COVID-19. Now the precautionary lockdown has restricted offender movement at the PAC unit to the extent that with only a few exceptions, the only offenders with which an offender has close contact are those in his dorm. So all offenders assigned to a dorm in which an offender who has received a positive test result for COVID-19 was assigned at the time of testing are considered to have been in contact with the offender who tested positive. For this reason, the dorm is placed on medical restriction when that positive test result is obtained and that's per policy B-14.52 and that lasts for 14 days. I'd like to... The only inmates who are in the dorms 17 through 20 are inmates who've been in contact with the infected person. Your honor is asking as of today? Yes. Your honor, the most recent information I have available is from a letter that TDCJ filed in Judge Ellison's court yesterday and that is consistent with my understanding. Okay. I'd like to turn to... Let me ask, what are the people whose tests are Your honor is asking individuals who have been tested but we don't yet have results from that test. That's right. The letter that TDCJ filed yesterday I don't believe speaks to that issue and I don't have that information. I don't believe it's in the record. I'd like to begin with the first fatal dispositive defect in the district court's preliminary injunction which is that plaintiff's claims are barred by the PLRA because... So Mr. Hawkins, can you hear me? Yes, Judge Duncan. Great. I haven't done this before so this is a little strange. So I wanted to ask you about exhaustion which is what you're about to talk about. There's been some discussion in the letters and in the briefing about an informal grievance that was allegedly filed on March 27 by Mr. Valentine. Now my question about that is, why does it matter? Because as I understand, all we're talking about with respect to exhaustion is whether the grievance process is unavailable. So nobody, as I understand it, is arguing that Mr. Valentine or Mr. King exhausted any grievance. So is that right? Are all we really talking about here is whether the exhaustion process, sorry, the grievance process is available under Ross versus Blake? Yes, Judge Duncan. I think that's accurate. Let me go into detail on that. Everyone agrees that the plaintiffs did not exhaust their administrative remedies. So Judge Duncan, you're exactly correct. The question is whether those administrative remedies were unavailable. Now the plaintiffs bear the burden of showing that they were unavailable as Justice Sotomayor's statement noted twice and as the Rinaldi case at page 27 of our brief indicates. They have not put any evidence whatsoever as to unavailability, and that's one reason. I understand that, Mr Hawkins. Let's assume that the Valentine grievance and the King grievance are in the record, because I mean, I've read them. I've got a Valentine grievance from April the first. I've got a King grievance from April the second, and I can read them and see what they were additional cleaning supplies, gloves, masks, and I read the response from April the 22nd from the prison that has a response on those various measures. I don't understand the argument that the grievance process is not available if what I'm looking at is the prison's response to a grievance. I just don't understand how that can show it's not available. I completely agree, Your Honor. The record shows that the grievances that they filed, the things they were asking for, were things that the PAC unit has provided. Now, Your Honor mentioned Ross versus Blake. Mr. Hawkins, you agree that filing this informal grievance is a prerequisite to filing a formal grievance. Isn't that correct? Yes, Judge Graves. And so you have to file first this informal grievance, and the inmate has to wait to get a response to that informal grievance. Is that right? Your Honor, offenders in the PAC unit have to pursue informal resolution before filing their step one grievance. All right. And so, and in this case, we have an appeal. Not in the record on appeal, Your Honor. What we have in the record on appeal is at page 361, which speaks about the issues that the plaintiffs asked for in their step one grievances. And the key standard here from Ross is they have to show that the prison was, quote, unwilling or unable to provide relief. The record shows the opposite. As Judge Duncan mentioned a moment ago. I guess what I'm getting at, though, is how long does that grievance process take to play out? Well, Your Honor, in this case, the items that they were asking for were provided quite quickly, and that's the key to the district court's error. The district court assumed that the PAC unit wouldn't address the grievances until the middle of May. Now, extra record evidence shows that that's not the case. But moreover, information that's actually in the record shows that the items they asked for have been provided in the PAC unit and were done so mere days after those grievances. And so let me ask you this. In this case, what would exhaustion of the administrative remedy look like? Because what you're telling me is he filed an informal request March 27th. He filed a formal grievance. One of them did on April 1st. And you're saying within days, but then you say he got a formal response, I guess, on April 22nd. That's not in the record, Your Honor, but we do have information showing that that's the case. Okay, well, let me just ask this question. What would exhaustion look like? What would the inmate need to do to exhaust his administrative remedy? Your Honor, the Supreme Court has said in cases like Ross v. Blake and Woodford and all the cases in our brief that they have to complete the administrative process. And if they do not get the relief that they're seeking, then they can proceed to federal court with a federal lawsuit. And they skipped that step entirely. And the preliminary injunction in excusing that is founded on a legal error. But we don't know how long it would have taken to exhaust that administrative process, do we? Your Honor, the test is whether the plaintiffs have evidence the prison was unwilling or unable to resolve those grievances. And there is no information in the record showing that that is the case. Indeed, the record evidence shows the opposite, that we were willing and were able to redress the items that they raised in their grievances. I have very limited time remaining. I'd like to move on to the deliberate indifference. Let me just ask you one other thing about that. Do you have, there was some indication in some of the responses that that there was internal prison record that refuted Valentine's handwritten remark on the top of a pretty much one that he submitted it on March 27. What's the nature of that record? Well, Your Honor, the information that the state has, again, stepping outside of the record shows that plaintiff Valentine submitted an informal request to somebody who is not a defendant in this case and that the prison had no notice of that until March 30, until after this lawsuit was filed on March 30. That would conflict with his handwritten statement. What I'm asking you is what is the nature of the internal record that shows that? Your Honor, I'm not quite sure what Your Honor is referring to. Whatever you have that would refute the handwritten statement. Well, Your Honor, the handwritten statement says that he filed something dated the 27th. We have a record showing it was dated the 28th and that it wasn't received until the 30th. So the record showed it was filed on the 28th. No, Your Honor, there's a document that's dated the 28th that one staff member at the PAC unit received on the 30th, and that person is not a defendant in this action. I beg of the court to allow me to address the dispositive Eighth Amendment defect in the district court's preliminary injunction. I see I'm out of time. I have lots of questions about the Eighth Amendment. We haven't gotten to it yet, so I'd like to ask my questions. Yes, Your Honor. You may. Great. On the Eighth Amendment, what I'm having trouble understanding is the nature of the complaint or the nature of the deliberate indifference finding in the district court's order. Is it about the policies, or is it about the failure to implement the policies? My understanding, Judge Duncan, is it's the latter. The plaintiffs are saying that even though we've implemented, even though TDCJ has promulgated policies, they're not being implemented. Okay, so that's my understanding as well. So I want you to respond. There's some very specific findings about failure to implement on specific things. Now, you may have some more in mind, but I'm thinking about gloves for janitors, cleaning solution for janitors, cleaning of cubicles, and then a very vague and difficult to understand complaint about the response to the clerkly death. So what's your response to, basically, you may have policies about these matters, but you're not implementing them, and that shows deliberate indifference. Right, and that's incorrect, Judge Duncan. I'd like to explain very carefully why. The legal standard for an Eighth Amendment violation is the wanton infliction of unnecessary pain, and that standard is akin to criminal recklessness. Now, to meet it, the plaintiffs have to show, Judge Duncan, that these two defendants, Collier and Herrera, personally had a sufficiently culpable state of mind, and as the Wilson case and the Helen case both indicate... I know what the standard is. What I'm concerned about is, well, there's an evidentiary finding that janitors weren't given gloves, or janitors were only given one pair of gloves. Your Honor, as a matter of law, that evidentiary finding is insufficient to find an Eighth Amendment violation as to these two defendants. TDCJ has promulgated policies. The defendants, Collier and Herrera, are implementing them. Now, if there's testimony, as there was, that certain parts of those policies are not being executed perfectly, what we're missing is the link between that failure to implement and these specific defendants. Remember, they need to show that these two defendants subjectively intended to inflict wanton pain on these... Well, I get that. Yeah, I get that. Okay. But don't we have experts? I mean, were the experts saying, you're not implementing the policies? Your Honor, there's an expert from the Washington State prison system who talked about what he viewed as best practices, but none of that goes to show the subjective element of the Eighth Amendment violation. There's absolutely no... Look, I read all the testimony. Does that expert say Texas isn't implementing its own policies? No, Your Honor. I don't believe the expert does say that. What the expert does is make recommendations as to what he thinks good policies would be. And this brings me to another error in the District Court's Eighth Amendment analysis. Not only is there no evidence as to these specific defendants, but the District Court wrongly assumed that the end result proved deliberate indifference. The Supreme Court has rejected that analytical approach, and so has this court in cases like Shepard. That's not enough to show that these two defendants used inadequate efforts. They have to show actual intent, Judge Duncan. That's Adams versus Perez, pages 35 through 36 of our opening brief. There's a third mistake the District Court made as well in the Eighth Amendment context. The District Court wrongly concluded that the defendant's approaches showed deliberate indifference. Now, one example I'll point to, Judge Duncan, is the hand sanitizer issue. The District Court faulted defendants Collier and Herrera for not providing hand sanitizer, but that's a perfect illustration of prison officials needing to make constrained choices while dealing with the trade-offs and security risks inherent in running a prison. This is that prisons have to use hand sanitizer for inmates? No, it does not, Judge Duncan. The CDC's primary recommendation is unlimited soap for handwashing. That is preferable, and it's undisputed in this case that the plaintiffs have access to unlimited hand soap and unlimited handwashing opportunities. Now, against that backdrop, any health risk they're concerned about has been abated by the prison, and there's no need to provide hand sanitizer, which presents two independent risks of its own. For one thing, hand sanitizer is a flame accelerant, and for another thing, hand sanitizer is liable to be consumed, to be drank by inmates, and you don't have to take my word for that. Their own expert, Mr. Vail, testified that that was a problem with giving hand sanitizer to inmates, and indeed, that happened to the Nevada Department of Corrections just a few days ago. One final error in Judge Ellison's Eighth Amendment analysis, he relied on his personal knowledge of matters outside the record. In particular, he based his view on part on defendants' supposed violations of an unrelated settlement agreement in an unrelated case several years ago. Now, that's an error. Is it in the record, Mr. Hawkins? Where is that in the record, that the judge is relying? That's a Cole case, right? Where in the record does he do that? Your Honor, it's in the primary injunction memorandum. He speaks, he uses the defendant's conduct in the Cole litigation to infer a subjectively criminally reckless state of mind in this litigation, and that is a plain error. It shows that Judge Ellison did not confine himself to the record before the court, and under this court's en banc decision in Vesey versus Abbott, any reliance on unsound evidence like that requires vacature. Mr. Hawkins, I've added five minutes to your argument time, so unless one of the panel members has any other questions, your time has expired. Let's add another five minutes, can we, Judge Davis has a question. Yeah, Judge Graves, would you add another five? Yes, sir. Okay, I appreciate it. All right, Judge Hawkins, were you, I mean, I'm sorry, Judge Duncan, did you have more questions? Yeah, just one more question. All right. So, given the updates, I mean, we received several updates on measures that are being taken in the PAC unit, and they appear to be increasing. Is it correct to say that the PAC unit is now taking some measures, a number of measures, that were ordered by the preliminary injunction? Is that right? Or help me with that. No, Judge Duncan, I don't think that's correct. The PAC unit has taken a number of measures, gone above and beyond the constitutional standard to ensure offender safety and staff safety, consistent with best practices and federal recommendations, and our best scientific knowledge that is constantly evolving by the day. Now, Judge Duncan, some of the measures we're taking are consistent with some of the items that Judge Ellison ordered in the preliminary injunction. For example, access to unlimited soap and water for hand washing, but it's not correct to say that TDCJ is doing that because it was ordered to do so. Oh, no, that wasn't my question. I understand the PEI has been stayed, but we've been seeing increased measures that the PAC unit has been taking. What I'm trying to understand is, at a minimum, I don't know if it makes sense to say the preliminary injunction is moot in that regard. If you're already doing things that are consistent with the preliminary injunction that was stayed, what do we do with that? Do we have to send it back for the judge to amend the preliminary injunction? Well, no, Your Honor, the preliminary injunction is unlawful because it's inconsistent with the PLRA and the Eighth Amendment. Setting that aside, Your Honor, the problem with the preliminary injunction is that it ossifies our approach to responding to this pandemic. It locks us into doing certain things, and as the state panel put it, it requires us to get a permission slip from the district court any time our scientific knowledge changes, any time the recommendations change, such that we want to change our policy. That's the real problem here. And to illustrate my point, the CDC's to adapt. Judge Ellison made much of the fact, for example, or made much of the idea about sanitizing surfaces every 30 minutes. Well, the latest CDC guidance is showing a shift away from fomites. Fomites are no longer considered the primary transmission vector, and yet if we were operating under this now obsolete preliminary injunction based on old science and old facts, we would be wasting time and resources that could be more valuably used in protecting offenders in other ways. Mr. Hawkins, the primary recommendation, as I understand it now from the experts, is to provide for social distancing, and that means at least six feet between offenders. Has the state done that? Your Honor, Judge Ellison recognized that it is impossible to implement social distancing in any correctional facility, and that is why the injunction doesn't order us to implement social distancing. Well, I know, but as you state, you're not limited by what the injunction requires you to do if it's something that's necessary to prevent the spread of the virus. And we now have approximately 200 inmates in the PAC unit who tested positive for the virus, and that mostly happened in the month of May. So by the end of June, if you assume that without social distancing, that number will increase to five or six hundred cases, such that half the prison population will be infected with increased hospitalizations and death. So if the experts, if we had a hearing today and the experts testified to that, would the state's answer be the same, that there's nothing it can do to spread out the prisoners to give them social distancing? Your Honor, we have encouraged prisoners to use social distancing, and we've implemented things like lockdown and restricting movement. They're sleeping in their bunks. They're staying in their bunks most of the day, and they're not socially distanced. But they are separated by the cubicle wall when they're sleeping. Well, a half wall. Your Honor, that wall is high enough such that when they're sleeping in their bunks, they are not in direct line of sight with anybody else. What's the height of the wall? I don't know that the record answers the specific height of the wall. There are photos of the walls in the record, Judge Graves, in the sealed record. I believe it's pages 12 and 11. I looked at the photos, and I looked at a walker that was in one of the cubicles, and I tried to judge the height based on the walker. And at best, if an inmate is standing, I don't know how that wall would be above stomach or maybe chest height, unless somebody was unusually short. Now, that's just my estimate, but I don't know how they can social distance when you're talking about cubicles. Your Honor, I haven't seen any. I'm confused now. Did Judge Ellison order anything with respect to social distancing? My point was that the state is arguing that they've done everything they can, even without regard to the injunction. So that's what I'm asking them now. Your Honors, there were a few questions in there. Judge Ellison has not ordered formal strike social distancing measures because he recognized that it is impossible in any correctional setting. To Judge Graves' question, the record, I don't believe, reflects the exact height of the cubicle walls. And Judge Davis, to your point, the state is actively engaged every day in finding new ways to continue going above and beyond the Eighth Amendment's requirements and ensure that there is social distancing to the extent practical and possible in a prison. And of course, that's why Helling talks about, when we're looking at the Eighth Amendment, we have to take into account the practical constraints and realities on prison officials. I see that I'm out of time. I would beg the Court's indulgence to just make my final point about the overbreath of the injunction, if I may. Two sentences. The District Court's injunction is impermissibly overbroad because the District Court never considered whether less restrictive means were available that would only provide relief to these two specific plaintiffs. The District Court should have looked into whether there were measures that addressed these specific plaintiffs' risks that they presented, and the District Court didn't do that. Thank you, Your Honor. All right. Thank you, Mr. Hawkins. Kelly? Yep, you need to unmute, Mr. Cabile. All right. How's that? Can you hear me now? We can hear you now. Okay. May it please the Court. John Cabile for the plaintiffs. Your Honor, this case was brought to protect a particularly high-risk class, elderly and inmates at the PAC unit, a geriatric prison from the irreparable harm of loss of health, loss of lives in the face of the COVID-19 pandemic. When this case was filed, defendants stated there were no COVID-19 positive cases in the PAC unit, but they admitted it was a matter of if not when the virus reached the PAC unit. When the injunction hearing occurred, only one inmate had died. Up through the injunction, defendants repeatedly told the Court that they had policies that they were following based on the CDC guidance, and they repeatedly said that they were not being unreasonable and that they were not deliberately indifferent because they filed the CDC guidance. But the unrebutted evidence from multiple sources showed they were not following those policies. They had repeatedly ignored the CDC guidance. Mr. Cabile, is there any evidence in the record beyond the testimony of King and Valentine that the PAC unit is not implementing the policies? Yes, there is record evidence. Beyond Valentine and King, okay, what is it? There is some. Judge Davis asked about social distancing, and that's one. The CDC guidelines instruct that as part of the prevention practices. I'm asking whether there's evidence in the record that the TDCJ and the PAC unit is not implementing its own policies. I have read, believe me, all of the testimony. Is there anything beyond King and Valentine that the PAC unit is not implementing the policies? I think those are the primary pieces of evidence, but that evidence was unrebutted. The defendants had the opportunity to testify at the hearing. They chose not to. The Defendants Council had the opportunity to cross-examine King and Valentine on their testimony of what was not being done, and they chose not to. Okay, so with respect to a failure to give enough gloves to janitors, the only testimony we have is Mr. King. That's it? No, that's not correct. Okay, what else do we have besides gloves for janitors? We have a picture which is in the record at 1193 that defendants submitted themselves that shows the janitor mopping with no gloves and no coveralls, both of which are required by the CDC guidelines that they say they're following. So a picture. Is there any evidence whatsoever that the prison officials knew about a lapse in handing out gloves to janitors and did nothing to remedy it? Yes, the picture itself would be the evidence. The picture was attached to Warden Herrera's declaration, and Warden Herrera submitted that this was an accurate picture, and the picture plainly shows that the janitors are working without protective equipment. What else did Warden Herrera say in his affidavit that indicated knowledge of the conditions in the dorms? Warden Herrera in his declaration basically only said that they had policies. Warden Herrera chose to provide no evidence of how those policies were actually implemented, and as the warden, it all comes up to him to ensure that the policies are being implemented. Did he mention any special policies that would relate to this PAC unit that is primarily a place for old people, old prisoners and sick prisoners? No, and to that point, Judge Davis, that shows the deliberate indifference. The CDC guidelines on the very first page, if you look at the record, it's the only thing in bold. For example, at 555 in the record, the only thing in bold on the first page of the CDC guidelines says the guidance may need to be adapted based on individual facilities, physical space, population, and conditions, and the record evidence is that there was no attempt made whatsoever to try and adapt to protect this and there is record evidence that they knew Dr. Herrera for cross-examination, did it? No. He has been deposed in discovery since then, but they did not produce him and they did not put him on any live testimony from Mr. Herrera or Mr. Collier. Isn't it your burden to show deliberate indifference on the part of prison officials? It is our burden, and I think the fact findings below are very clear in showing the multiple examples of deliberate indifference. For example, just what we were just speaking about, Judge Davis, no adjustments to protect this particularly elderly and vulnerable population when they repeatedly said the evidence that they were not deliberately indifference was that they were following the CDC guidelines, but then made no attempt to do what the CDC guidelines say, which is to adjust for this population. Tell me one adjustment that they failed to make that shows deliberate indifference. Well, there are multiple adjustments. Sure. For example, the social distancing that the CDC guidelines require, there is unrebutted evidence that they had a dorm that was empty, half empty, with population potential of 282 people. The CDC guidelines specifically say you should consider making adjustments to the housing if space allows. Are you talking about the testimony of Mr. King with respect to a half empty dorm? Is that the evidence? That is the evidence that is unrebutted. Yes. Is that the only evidence with respect to an alternative facility that the prison is allegedly not using? Mr. King's statement. In the record below, that is the evidence as to space that they were not using that could have been used, and it is a significant amount of space. What about the gymnasium? The gymnasium, there was dispute about whether it was air conditioned, and so there is certainly space that they could use. As the record was, there was no attempt to potentially put in air make that space usable to promote social distancing. You know, so you're talking about social distancing. I am reading from Judge Ellison's statement here at page 1041 of the record. Even the most ably run institutional setting would find it difficult to have social distancing as people went through the chow line, people went the pill line, people use available restrooms. I don't think that was a serious point of dispute, and it's not the fault of anybody in the PAC unit. That's the judge himself saying that. So how could there be deliberate indifference based on a failure to socially distance in a prison? What the defendant stated to the district court and what Warden Herrera said is the PAC unit was promoting social distancing, and then other times they said social distancing is being encouraged, and the undisputed evidence was the prison did not require Mr. King or Mr. Valentine to maintain six feet during group activities like being in halls, meals, showers, recreation. Mr. Valentine testified at the hearing that in the hallways, inmates were very crowded up to the gates, less than a foot apart in the serving lines, and in showers about three feet apart. So encouraging social distancing was actually not happening, but more important, this is a prison. If there is any place where they could have followed the CDC guidelines for prisons, which say not that you should promote it, but quote, you should enforce increased space between individuals and lines and waiting areas, they did not enforce it. Admittedly, they didn't do that. What does Judge Ellison's preliminary injunction provide with respect to what you just told me? Enforcing social distancing in shower lines and the showers. Does it say anything about that? It does not because he did not go to micromanaging that. It is evidence, Judge Duncan, of deliberate indifference, but they had a guideline that said that they should enforce it. They had the ability to enforce it, and they chose not to. They chose to encourage it, and then despite that supposed encouragement, the unrebutted testimony was prisoners were often one foot apart. With respect to exhaustion, I see, at least I think it's in the record, a grievance filed by Mr. Valentine on April 1st and a grievance filed by Mr. King on April 2nd. Mr. Valentine's grievance references specific items, hand sanitizer, cleaning supplies, gloves, masks, and I read a response from the prison that specifically addresses those complaints on April the 22nd. Now, in light of that evidence, how could I possibly find that the grievance procedure is not available within the meaning of Ross versus Blake? I see evidence of the process going on. Well, let me make two points to that. Number one, you do see evidence of the process going on because the process is still going on. We are now in the step two process of the grievance procedure. So while this grievance procedure was started and goes on, Mr. Valentine has been tested positive for COVID-19, which presumably was not at the beginning. So the it's the textbook example of what the Supreme Court was talking about in Ross, which is a process which is a dead end. How can it be a dead end when a prisoner says, I need hand sanitizer? And within three weeks, the prison says, well, look, we have ample, ample soap being provided. And the CDC specifically says that hand sanitizer is not required. The prison is responding to the complaint. I mean, this is not a, well, sorry, there's just no way that you can get any response whatsoever. He's getting a response. He's not getting the response he wants, but that's not the test. I just don't understand how this fits in any of the categories of unavailability in Ross. Let me ask you this. Would the fact that we now have 191 infected prisoners, many in the hospital, many deaths, indicate that there was effective relief that could be provided by administrative exhaustion, that any relief could have slowed or stopped the spread of this virus? Administratively. Judge Davis, there can be no more stark evidence of the fact that the grievous process was a dead end in the facts of this particular case, and no more stark evidence of irreparable injury than the fact that while the grievance process still goes on, over 160 inmates and staffs have tested positive. I think I heard 190 this morning. What I get from that answer is this. Let's see if you agree. When there is COVID in a prison, there is no requirement for administrative grievance, period. You can just file a lawsuit. No, that's not what I'm saying. Once in a generation situation like this, where allegedly there were no inmates who were positive when this was started, and the district court tried to implement a narrowly tailored injunction that at this point, the grievance process has not addressed. Judge Duncan, one of the points you said is that it was responded to. They said while there's soap and cleaning supplies, there was unrebutted testimony that the cleaning supplies are not being provided. There's a minimal amount being provided that is not in accordance with the guidelines or in accordance with the CDC recommendations. While the injunction was what Valentine was seeking, I interpret that as a yes answer. While there is COVID in a prison, there is no grievance process. I think if there was a grievance process that was tailored to function to something like this, to a pandemic, then the answer would be no, that you could have a grievance process. This grievance process is not tailored and is not functional to respond to the COVID-19 process. So it's only a particular way that it would be functional is if there were no other infections. No, the way it would be a measure of it being functional. No, no further infection. The measure of provisions in the grievance process that's in place now provide for any special way to grieve an emergency situation like this, like reducing the deadlines that the state has to respond or any other special provisions for emergency grievance. No, there are no such provisions that I'm aware of, Judge Davis. And the evidence before the deadline to respond to the step one was May 11th, unless they seek an extension as permitted by the offender grievance. So the record evidence is that the defendants did not tell the district court they were in any way going to speed up the grievance process. What they actually told the court was they could slow it down even further if they chose to. What am I reading on April the 22nd? Is that not a response from the prison with respect to the step one grievance? That is a response to the step one grievance. That is correct. That was much quicker. The deadlines are just the outer bounds. This was a response within 21 days. Yes, but it's my understanding there is still no response to the step two grievance and that process goes on. And so in fact, the remedies would not even be exhausted today. We could exhaust the existing grievance process remedies. Let me ask you this question, quite frankly. You know, when the hearing was held, was that April? I think April the 16th. What had had Clarkley's infection showed up then? Yes, it was just two days before that we were notified that Clarkley's infection had shown up. Interestingly, Judge Davis, even though it's not in the record. So you had one infection in the PAC unit and the district court's injunction ordered relief in the form of steps the state should take to avoid the spread of infection in light of the that evidence that was before him. Now we have almost 200 infections and multiple hospitalizations and death. What what is what's your position on whether the relief ordered by the district court on April 16 is adequate to likely stop the spread of infection under circumstances that now exists in the unit? That Judge Davis, I would say there needs to be much more done, and we're in the process of examining that. However, the injunction that was in place is things that are necessary to help prevent the spread, and those things should still be in place. What additional steps would you urge the district court to take if you had the opportunity to do that? We may, Your Honor, but it was just yesterday that we got a listing of what additional steps they're taking. We haven't had any chance to look into how they're implementing that, so I can't really comment on that yet. I would assume that there should be additional steps, and we need to evaluate what they're doing. What we found in the case below. Let me just ask you one other thing. I'm going to ask you by Monday to consider what additional steps you would ask the district court to take if you had the opportunity, and advise the panel whether you would ask us to consider remanding this case to the district court to modify its injunction in light of the current circumstances. Just give the clerk a letter on Monday. We will do that. Thank you, Judge Davis. I'm sorry, you haven't asked us for that. You haven't asked us to do that, have you? I'm responding to Judge Davis's request. I know that, but you haven't asked us to do that. No, we have not asked the court to do that at this time. Won't you have an opportunity at a trial on a permanent injunction to adduce additional evidence and to propose whatever you like? That is true, but the trial is still two months away, and this infection could spread even more rapidly if steps aren't taken. All right, Mr. Goebbels, you may proceed. Anything else? No, I would say this is the prototypical case for why the exhaustion remedy is not available in this case. It has spread rapidly. The evidence has shown that without the preventative measures allowing the prison to go forward with their haphazard and often not following their own policies, procedures of preventative have not worked. The grievance process goes on while people have become infected, and the deliberate indifference, I think there is more than adequate fact-finding below that cannot be overturned because there was no contrary evidence to refute any of the medical testimony or any of the fact testimony from Mr. Valentine or Mr. King. All right. Thank you, counsel. Thank you, Judge Graves. Can your honor hear me? We can. Your honor, I didn't hear any response from Mr. Kevel to the dispositive point that there's no evidence in the record linking the evidence that he's talking about to the subjective intent of these two specific defendants. What the plaintiffs are really asking this court to do is overrule the Shepherd case, which we talk about in our brief in which they have never responded to. The Eighth Amendment does not require us to be successful in eliminating or diminishing risk. It just says that we cannot disregard known risks, and the record shows that the PAC unit has been the opposite of deliberately indifferent. Unlimited hand soap and water, masks for everybody, lockdown to prevent visitors and transfers and movement among dorms, medical isolation, medical monitoring, waiving copays, delivering meals and medications, all of the extensive education. Mr. Hawkins, I know that we have lots in the record about the number of times that the prison has updated its policies. Where can I find the most recent sort of compendium of the policies that are actually in place right now in the prison? Where is that in the letters and the briefs and everything? Judge Duncan, I think the best source I would refer your honor to is the letter that TDCJ filed yesterday with Judge Ellison in district court. It's, I believe, about 20 pages, maybe more, and it documents not only the material that I talked about earlier, but the other steps that the PAC unit is taking to continue going above and beyond. I'd appreciate it if you'd file that with our panel, please. Yes, your honor, we'd be happy to file that as a 28-J letter today. Do those updates include providing for social isolation six feet between prisoners in the dorm? If your honor means social distancing, as Judge Ellison acknowledged, that's impossible to do in any correctional facility. But I want to stress, your honor, that we are now requiring mask usage and have been for some time. And that negates the need for social distancing when every offender and every staff member is required to wear a mask, except when they are lying down asleep. So let me ask you, Mr. Hawkins, when you say medical isolation, what does that mean? At the facility, how is that achieved? Well, your honor, that's something that I spoke to earlier in response to the court's written questions. Well, I'm asking you to speak to it again for me. What does medical isolation mean at that facility? Right. So dorms 13 through 16, Judge Graves, and cells in the restricted housing unit are used to medically isolate those who have tested positive. And there's more information about that in the TCJ letter filed yesterday that per Judge Duncan's request, will file as a 28-J later today. I wanted to also note... I heard counsel say something. Let me put it in this sort of common sense way. You've got a bunch of unused dorm space that you're not using, and you could use that to socially distance prisoners, and that's deliberately indifferent. What's the evidence in the record as to that? Your honor, Plaintiff King, at the primary injunction hearing, said that he thought that was unused space available. There's nothing linking that to defendants Collier and Herrera. That does not show wanton criminal recklessness. There are parts of the PAC unit that are under construction to make them compliant with wheelchair accessibility. And as a result of that, there are some parts due to construction that are not habitable at all times. That doesn't show that Herrera and Collier have been deliberately indifferent to the level of responsibility. Are you saying that the plaintiffs have to show that the infection has to happen to them personally, or they must be exposed personally? I mean, how can they be protected if you don't protect the other prisoners they're in contact with? Well, your honor, the PLRA requires the district court to ask that exact question, to ask, how can we, prior to class certification, protect only these two plaintiffs? And the district court didn't ask that question. It imposed class-wide relief across the entire PAC unit, even though there's been a lockdown, even though there's no transfer between dorms right now, it nevertheless imposed class-wide relief without asking what your honor's alluding to, whether there was specific remedies that could have been taken only to these two plaintiffs. If the protective measures don't protect the guy in the next bunk from violent time, he's not protected, is he? There may be ways to protect him if his housing situation were changed, if he was given specialized protective equipment. I don't know, Judge Davis, and the reason I don't know is because the district court never asked that question, even though it was required to do so by the PLRA. I don't believe you will find anywhere in the record where the expert said that providing masks was a reliable substitute for social distancing. If you can point me to something, I'd like to see it. Your honor, the CDC itself recognizes that masks are an important part of responding to the pandemic. And there's recognition in this court's case law that in the prison environment, officials are subjected to the constraints of running a prison. And that is the law. What I asked you was, is there anything in the record that say that masks substitute and make unnecessary social distancing? In the record on appeal as it appeared on April 16th, I don't know that that's in the record on appeal as it appeared at the time. And I don't know about the subsequent guidance from the CDC since then. And that brings me to what the plaintiff's real complaint is. Your time has expired. Give you a couple of sentences to sum up. Your honor, they're asking this court to create a internal split, both with the state panel opinion and with the shepherd decision. And I've heard no response from Mr. Kevel ever to the 11th circuit swaying case. We discussed that extensively on our opening brief. They didn't respond to the response brief and he said nothing about it today. He didn't deny that affirming this preliminary injunction will create a circuit split with the 11th circuit. All right. Thank you, counsel. Thank you. All right. All right. We're going to take this matter under advisement and we stand adjourned. Thank you, your honor.